May it please the Court, Carlos' mother drank 24 cans of beer a day throughout his gestation. This permanently affected his cognitive brain development and function. His sentencing jury should have heard such compelling mitigating evidence. That alone should give this reviewing court pause when deciding whether it now lacks the confidence in the questioned verdict. I'm sure you will address as you go through your argument the double-edged nature of the evidence. Yes, sir. But that's not the only reason why this court's confidence should be shaken. The synergistic effect of the wealth of additional mitigating evidence found by the District Court in 2009, combined with the new fetal alcohol evidence, takes it to a whole new level. Its substantiality now becomes so apparent that it should give this court pause. And that hesitation, that lack of reliability, should undermine this court's confidence in the verdict below. The probability of a different result is sufficient to undermine the confidence in the outcome, and that counsel's deficient performance, therefore, requires a new trial. Review for us what mitigating evidence was presented. Yes. I think we should start with the District Judge's finding in 2009, which is found in the Record on Appeal at page 1706, which was adopted in this court's decision last July. It was recited in this court's decision that the Petitioner has presented this court with evidence showing even the most minimal investigation into Petitioner's background through rudimentary interviews with family members and review of relevant school and medical records would have revealed a wealth of additional mitigating evidence, and more far substantial than the superficial account of Petitioner's childhood given by Petitioner's lone witness at the punishment phase of the trial. So I think, Judge Smith, what you wanted to hear was things that the jury didn't hear that we uncovered that were part of our pleading. That Carlos's mother was sexually abused and physically abused as a child. That she drank a case of beer a day throughout her pregnancy with Carlos. Carlos weighed four pounds at birth. She didn't touch him for the first four weeks of his life because he was in the needle, natal intensive care unit, so they didn't have that physical touching that a mother helps in that initial phase of a child's development. His sister Elizabeth died of SIDS, sudden infant death syndrome, at three months when Carlos was only four years old. What evidence was presented to the jury through the single witness? It was five pages. It was five pages that the aunt gave, and it's so cursory, if you'd like, I can read it to the court. It's, I have it, but basically she said that his mother was sexually abused. And that was about, that's about the size of what she talked about. Well, my notes here indicate that she testified the father was largely absent. The mother had alcohol problems. The family was on welfare. Trevino was a loner in school. He dropped out of school and went to work for the mother's boyfriend doing roofing work. He's the father of one child and is good with children, and she knows he is incapable of committing capital murder. Was all that in the record? Yes. And that's, and it comes out in a one-sentence response to a leading question, and that comes out in a quick five pages of testimony. And that's in the record. Did he say what his trial strategy was, the defense counsel? It really, that didn't come out until the state habeas, and basically they just, it was really trying to put a mercy plea out. There was no, there was no investigation into his background, and that is the trouble in this case, that Wiggins requires an informed, educated, reasoned decision before you proceed to determine how to go about the trial, and that wasn't done. There was no development of this case by those attorneys, and they admitted it. They said, you know, in retrospect, at the habeas proceedings, they said, I guess we should have gotten a mitigation expert. And what's interesting is, in the Gonzalez case, which we include in the record, is the same attorney, Mario Trevino, who was the attorney for Carlos, and he had tried Gabriel Gonzalez's case, and five months earlier, in Bexar County, it's the same courthouse, the same crime, capital murder case, and he did the same thing. He did the exact same thing in that case. One witness, cursory presentation of his background, but in that case, there was a competent state habeas attorney. The lawyer said he was not in contact with Defendant Trevino's mother, but that he saw her in court once, or thought she was in court. Was Defendant Trevino in contact with his mother during this? I don't know if Carlos was in contact with his mother. I've never heard that, but the attorney who did testify was in contact with the mother, and that's how she knew to come down to court when his brother, Peter, was being tried at the same time in another courtroom in the same courthouse. So they had a, and in fact, this court's decision in July said that our explanation of her being there was more plausible than the state's presentation, belief that, why she wasn't there. They had the ability to find her. She was not that far. She was 60 miles outside of San Antonio. They had an investigator. The investigator's records, his itemized billing is in the record, and you can see that he didn't approach her. It's found in Volume 2 of the record, in page 207, and he has an itemized billing of what he did and didn't do, and he didn't do anything, talk to any witness, until the day of the punishment section of the trial in July. The investigator. Excuse me? You're talking about the investigator? The investigator for the original trial attorneys. He didn't go up to Bastrop or Elgin to try to find her. They knew she was up in Elgin. That was known. The aunt said she was up in Elgin. That's how I found her when I spoke to the aunt. She told me she was up in Elgin. So if, this guy's an investigator. He should know, he worked for the Bexar County District Attorney's office. Somebody said she had no phone or any address in Elgin. How did you find her? The aunt told me, now this was several years later, and she had sobered up a little bit. She was on felony DWI probation, and they told me that she was working as a custodian at the local school, and I got hold of her at the school, and I met her after work at the school. That was my first contact with her. But the aunt knew how to get hold of her. The aunt knew how to get her down to Peter, Carlos's brother's trial. She was calling down to talk to them. They knew where she lived, and they could have just given her an address. Elgin's not a big town. It's a small Texas town, a thousand or so people. You can find somebody there. Back at that time, she was getting arrested for DWI. Her first two DWIs. The district attorney's office knew where she was because they had her records. She was findable. They just didn't try. That's the problem. I was going to ask you, if you were going to address the double-edged effect, the prejudice of new evidence, can you point out to us what you think would be helpful as opposed to what you think would be relatively consequential and non-helpful in terms of mitigation? Well, I'd like to turn to a case, Judge Clement, that you're familiar with, Gates, that we sent on. And in that case, and in the Gates case, at page 278, it says, as the district court observed, the evidence of fetal alcohol syndrome deficiencies is mitigating in the sense that it might support an inference that Gates is not as morally culpable for his behavior. You're quoting from a case. Gates, which is a current case. It's 660. We just submitted a 28-J letter the other day, and we gave the court notice of that case. I'm sorry. That's a possibility. It has to be a probability. Exactly. So now we get to, how does fetal alcohol deal with... Now, the problem with Gates, as you well know, Judge Clement, you were on that panel, is the fact that they couldn't prove that Gates' mother was actually drinking alcohol during her pregnancy. But in Carlos' case, we have it from the horse's mouth, that she admitted and gave affidavits, both several times to me when I first met her, and to our mitigation expert when we went back this last time, and our mitigation expert re-interviewed her. And that goes to, when you talk about double-edged, what our mitigation expert was able to do was to ask questions that she knew to ask that I didn't know because I'm not trained that way. And what she was able to uncover was not just the fact that Carlos was drinking a case of beer, that mom was drinking a case of beer a day, but... Carlos might have been drinking it. Right. But the effects of fetal alcohol and what it does to a person's body, and not just after they're born, but before they're born. Speaking of negative double-edged evidence, as I understand it, this case is not like, say, Darden or that other case. Correct. I forgot the name of it. It started with a B. Where the lawyer didn't put on evidence because he feared it was double-edged. And the court says, that's okay if you investigate and you find some reason you don't want to put the evidence on, we're not going to second-guess you. But when you just don't investigate at all, which is this kind of case and Wiggins and Williams, that's when you don't get much of a defense at all. And an attorney should be looked at with some skepticism. And that's the whole idea that the decision, how to proceed, needs to be a strategic decision. And it has to be an informed decision. And that's what Wiggins and Rompela and Williams talk about. And the Gonzales case, again, talks about that. And I wanted to talk to you about what Judge Cochran, who wrote a concurring opinion, and she sums up, and again, this is the same attorney, Mario Trevino, who did as little for Carlos as he did for Gonzales, and she writes, Rompela says that the defense counsel may be required to investigate potential mitigating facts even when the defendant is uninterested in helping or even actively obstructive in developing a mitigation case. That both the Supreme Court standards and the Texas statutes, defense counsel has a constitutional duty to seek out the circumstances of the offense, the defendant's character, background, and any evidence that lessens the personal moral culpability of the defendant. And then she gives a laundry list of things as a starting list, and so many of the things in that case that Judge Cochran gives as a starting point, not an ending point, but as a starting point. Childhood accidents and injuries. Carlos had trauma to his head. Trips to the emergency room. She took him to the emergency room, but he didn't stay there. Serious illnesses at any time. Physical abuse to the defendant at any time or any member of his family. The reason that his mother became an alcoholic, one of the things, a mitigation expert, which was part of the problem in Carlos's case was we didn't get a multigenerational investigation, but Linda Mockridge, who we employed when you sent us back down last year, she did a multigenerational investigation, and she found out that Carlos's mother was an alcoholic, his father was an alcoholic, and then he left, and then the person that she got with, his half-brother, Peter's father, his stepbrother, Mr. Sanchez, was an alcoholic. So all of this alcoholism is not just in his presence, but it's in his DNA. Some people say that doctors say that alcoholism is hereditary, that it's genetic. So he has that going against him, plus he has the... Why would the alcoholism of a half-brother affect your client? It's the stepfather, and that he was abusing Carlos. For abuse, but not for fetal alcoholism. Correct, but he abused him physically and mentally, that he tortured him. In her report, that he didn't consider him his blood, so he pinched him. He didn't treat him as his own son, so he saw him in that light. So this is how... And that's part of... And I want to address what you were saying, Judge, about the double-edged nature of fetal alcohol, is that when a child is in utero, the alcohol that comes into a child's system, into that fetus's system, is not being dealt with as we are. Because a child who is in the first trimester, their liver hasn't started to develop yet. So if a woman, if the mother is drinking alcohol, and her alcohol, blood alcohol, is high, the alcohol that goes through the placenta into the child is not being processed by a liver, because the liver hasn't yet formed in the fetus. And the literature shows this, is that the child's blood alcohol is greater than the mother's blood alcohol. So what does that mean? So now the neurons in the developing fetus are not being developed the same as a normal child. So by the time the child is born, before they ever breathe air, before they see the light of day, they are damaged. And that damage is permanent, but it's manageable. And that's part of this business about double-edged business, is that a child who has fetal alcohol syndrome, it's going to affect him in a myriad of ways. He's going to have part of the... If you catch a child who has fetal alcohol, they're going to have dysformity. Their eyes are going to be almond-shaped. The feminine below the nose to the upper lip is flat. There's a thin hairline of the upper lip. So you can see that if you know what you're looking for, and that's what Jones and Smith, the two doctors in Washington State who first coined the term fetal alcohol in 1973, but they knew about this stuff beforehand, and when they started investigating it, they noticed that dysformity of the face. But it also has these attributes as well. It has poor coordination, hyperactive behavior, learning disabilities. The school records showed that Carlos was not doing well in school and that he ultimately dropped out. Developmental disabilities, speech and language delays. Linda, our mitigation expert, was able to determine that Carlos didn't begin speaking for 2 years. He didn't begin... He wasn't potty-trained until he was 6 years old. He was wearing diapers to school, which was embarrassing. But, Mr. Wolfe, let's try to stay focused. Yes. Say he has this condition. Yes. You still have Dr. Dyer, who's your expert... Correct. ...who said that the condition would not have significantly interfered with his ability to know right from wrong or to appreciate the nature and quality of his actions at the time of the capital offense. So he may be in a perfectly pathetic state, mentally or emotionally, but if he can still tell the difference between right and wrong to commit a murder, I don't see where this helps you. Well, it helps us if you continue in her report. She goes to say that the history of FAE clearly had an impact on his cognitive develop... And this is on page 1259 of the record. ..his cognitive development, academic performance, social functioning and overall adaptive functioning. It likely impacted his ability to understand and make appropriate decisions about his plea offer and that his attorneys didn't know it. So we're not talking about competency to stay on trial. We're talking about personal moral culpability, which is one of the questions that the jury gets when making a decision if somebody gets the death penalty. And what's interesting in this case... The jury heard evidence of his violent behaviour, did it not? They didn't hear all of the things that we got in some of the affidavits that we included the last time we were there. His explosiveness with his family members, his acting out. But, you see... Let me ask you something about that from the standpoint of prejudice. Now, if we agree with you that, on the first two prongs or whatever, that there was an insufficient performance by his defence counsel, and then we take this FAS evidence, which is mitigated, and we weigh that against what the prosecution introduced with regard to aggravation, that's the test. The prosecution can't bring in aggravation evidence that they did not introduce, can they? The things that they brought in, in our opinion, don't come near all of the things that we're talking about. And as far as fetal alcohol, to understand what the effect of fetal alcohol has on a child gives depth, it gives texture, it gives understanding to the jury so they understand why is Carlos the way he is. And the question is his personal moral culpability, and the scant evidence that the jury heard on page 199, and we included this as exhibit 10 in our record excerpts the first time, number 10 was a note from the jury, and they asked for, they wanted a clarification on the term personal moral culpability. Obviously the jury was concerned with personal moral culpability. The question, the jury question says, do you find that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than the death penalty? The jury, all they need to do is find one thing to pick out and say, this guy doesn't deserve the death penalty. And it's our position that if a proper presentation of his fetal alcohol condition that was no cause of his own, that was put upon him by his alcoholic mother before he was ever born, was explained to that jury with proper experts, they would have said, this guy doesn't deserve to die, he will vote for life. At least one, all we need is one juror. Well, you know, that's what I thought, but I read the sentencing transcript and the judge instructed the jury that you had to have ten vote for life. And this defense counsel apparently didn't object to that. Well, that's part of the problem. I know the attorney, he had come right out of the district attorney's office, and he had gone into private practice. So his experience in trying capital murders was on the other side of the docket, and he had virtually no experience defending them, obviously what happened in Gabriel Gonzalez's case. I see my time is up. I'd like to reserve the balance of my time. Yes, you've saved seven minutes for rebuttal. Thank you. Okay, Mr. Frederick. May it please the Court. The petitioner is not entitled to habeas relief for at least two reasons. First, he cannot prove, and he hasn't proven, that a more thorough investigation would have uncovered any evidence to support his theory of fetal alcohol spectrum disorder. And second, even if he could have discovered that, he cannot show a substantial likelihood that a more detailed picture of his background, including his claim of FASD, would have led to a different sentence. The first major problem for Mr. Trevino goes to his mother and whether she could have been found. That is primarily an issue of deficient performance, and there is no evidence in the record that, even had his trial counsel talked to numerous family members, that anyone could have led them to his mother. She has testified in her affidavit that, I did not have an address, I did not have a phone number, so that they could contact me. So that's the first problem. And by the way, she could have said, if they had called me, I would have talked to them. Or my half-sister Juanita, she knew where I lived. She had every chance to say that, and she hasn't. The same goes for his aunt. She could have said... But she was eventually found. How was that? We don't know. Mr. Wolf knows, but all we know in this record is, no address, no phone number at the time of the trial. Well, I mean, we can certainly accept Mr. Wolf's representations as an officer of the court as to how it came about. It doesn't sound to me as though it was that difficult. Well, the second problem is that what she has said, in addition to no address and no phone number, is that in 1998, she said, well, a lawyer did try to contact me. But she doesn't say she responded. In fact, she said, I didn't talk to any lawyer until I talked to Mr. Wolf. When did she move to Elgin from San Antonio? I beg your pardon, Your Honor? She moved from San Antonio to Elgin in what, about 1993, 92, something like that? That's right, in 92 or 93, yes. After living in San Antonio and having relatives in San Antonio, it's kind of almost incredible that a good investigator could not have found her. It's what, what, one hour drive from San Antonio to Elgin? Yes. Or two hours. But the flaw in that argument is that there is no indication that they had any reason to think that they should have gone to get her. And this is something that has to do with the remaining witnesses that he says should have been spoken to and put on the stand as part of the mitigation case. Isn't that the first rule of a mitigation investigation, which every defense lawyer is supposed to perform? Go talk to the parents. See how the person grew up. See what kind of a person he is. Even if that's true, Your Honor, there is no evidence in the record that they could have found her. His witnesses have had the chance to say otherwise, and they have uniformly failed to do so. Did anyone know that she had moved from San Antonio? His aunt who testified at trial did say that she lived in Elgin, and I think that was generally known. At trial? Yes, yes. If the lawyer had asked the aunt maybe, instead of just waiting until the day before the trial to talk to her, had asked her when he first got the case, when he first found the aunt, that's another thing that's very troublesome. Well, they want to make it sound troublesome, but they have an evidentiary problem. The evidence does not actually support their claim that nobody talked to his aunt until right before the trial. The only thing that's in the record is just a statement by the aunt that I met with them in the cafeteria before the trial and he said just to say what we talked about. She doesn't say it was the first time I ever talked to him, and that wouldn't make any sense anyway because how would she know how to get to the courthouse? The other problem is prejudice. Even if somehow he could have gotten in touch with the mother, gotten her to respond to him and admit that she had consumed alcohol during his gestational period, and even if he could have then developed a detailed theory that Mr. Trevino now says he should have put on, the question is whether there is a substantial likelihood that that would have led to a different result. Why don't you start by the same question I asked Mr. Wolfe. Recount for us what in your view is the mitigating evidence that was presented that the jury heard. It will be repetitious of what we've already talked about, but go over all of that and then we can compare it with what might have been presented. Of course. So there was his aunt, Juanita de Leon, who was actually a year older than him. Closer I think to brother and sister, but they had grown up together. She appears to be the closest person to him. She was put on, said he lived in a bad neighborhood, his mother has an alcohol problem, she's not here, she can't come, she's in Elgin. And then that she doesn't believe that Mr. Trevino could have done this. In addition to his aunt, the state put on his former parole officer, who also testified about his upbringing and the public housing development he lived in, his involvement with gangs. This is the state's witness or the defense? The state's witness, his former parole officer. And so that supported to some extent the general background. Mitigating evidence? That didn't sound like it. Well, that's the kind of evidence about his disadvantaged background, and it is double-edged, but that is the kind of mitigating evidence. I thought you were responding to Judge Smith's question, asking you to lay out the mitigating evidence first. That is part of the evidence that the jury had that falls into the same category of background character information that he says his counsel should have developed. Who testified about the 18 to 24 beers a day? Who? His mother is the only person who said that. And the other witnesses. That's a lot of beers to be able to count how many beers you had. I mean, there was no other testimony? It doesn't seem terribly credible to me. Well, there's nothing to support it. Whether it's true or not, we don't know, because she's the only one not only who said it, she's the only one who could have said it, because all of the other witnesses that he says should have been contacted, none of them could have supported that testimony. Even his aunt, Juanita, she was only a year older than him. So for her to have that kind of recall would be extraordinary. The aunt didn't live with the mother? No. And even if she had, she would have been one year old. So she couldn't possibly have recalled that. The same goes for his siblings, all of whom were younger, and everybody else came into his life much later. So nobody could have corroborated that. She was the key to this theory of fetal alcohol spectrum disorder. But even if he could have put that theory together and presented it to the jury, he has to meet a very high burden to show that there's a substantial likelihood, not just that it's conceivable that one juror would have made a different decision. And the inquiry is not just we weigh the mitigating evidence, or the aggravating evidence that was introduced against part of his mitigating evidence. The question is we weigh all of the mitigating evidence against all of the aggravating evidence that would have come in had counsel performed differently. And that means that we have to consider the mitigation case that he wants to put on, that he says his lawyer should have put on. And that includes a lot of aggravating evidence, including his former common-law wife's testimony about how he was incredibly violent toward her. Let me ask you a clarifying question. Of course. You're not saying that you can speculate what the state would have brought in in aggravating evidence if defense counsel had put in FAS. You're not saying that. You're saying that if the FAS has some bad things in it, you can argue that. Well, I'm saying a little more than that. I'm not saying that the state can speculate. What I'm saying is we have to think about this in the context of the mitigation case. He says his trial counsel was ineffective for failing to put on. That's not just FAS. That includes more evidence of character and background, and that is lay testimony. He mentions this at page 35 of the appellant's brief. There's a statement about creating the complete picture. And so he says, well, we need to put this in context, but if you focus on the FASD only, that takes it out of context. This is the case he would have put on, and it would have included negative aggravating testimony from the lay witnesses who knew him for most of his life, not only his common-law wife who said she was scared of him, he threatened to kill her. There are other worse things that are detailed in the brief. But you agree that if we get to that point, we weigh that evidence with its bad and good features against what the state actually put on at trial. The state can't go out and say, oh, we, you know, if he had come in with that FAS stuff, we would have found a lot more aggravating stuff to put on against him. Well, no, and that's not the point I'm making. The point I'm making is just that his argument is not that we would have just brought the FAS evidence in. His argument is they should have put on this entire mitigation case, which included but was not limited to FAS. It included context, lay witnesses, his brother, his sister, his former common-law wife, more from his aunt Juanita, and the evidence that was discovered by the investigators in his federal habeas proceedings is far more aggravating than mitigating. And so unless he is somehow willing to suggest that his witnesses would have come in and not given the whole truth, I don't think he can avoid any of that. Because had they gone on, they would have had to admit that, yes, I was terrified of Carlos Trevino. And when he, you know, after he got in the accident where he was thrown into a telephone pole and knocked unconscious and not treated, he became much more angry. And his common-law wife says he would just punch his brother Peter in the face for no reason. I mean, it is a detailed and consistent picture of an extraordinarily violent person that even if they had come in and said, well, there's this FASD too, there are several problems with that. And I think a helpful way to think of it is what would it be offered to prove? One thing would be moral culpability, you know, less moral culpability. Obvious problem with that is Ms. Dyer says it wouldn't have affected his ability to tell right from wrong. It might have been offered to show that he has diminished cognitive functioning generally. Well, the problem with that is there's a lot of other evidence that comes after his birth that could easily account for that at least as strongly, if not more strongly, such as, you know, untreated head injuries beginning at age two, getting thrown into the light pole, hitting his head on a piano and getting spontaneous nosebleeds afterwards. And then, of course, there's the drug use that begins at age 12 and is quite extensive including, you know, his sister testifies that he was constantly huffing paint and was sitting around in a daze with a big smile on his face. I mean, those are things that seriously impact cognitive ability. And so adding the theory of FASD to that, given the extent of evidence of concurrent causes of his alleged deficiency, he just can't show a substantial likelihood that the jury would have reached a different conclusion. There's also the problem to the extent that his FASD is offered to prove some kind of cognitive impairment at the time of the offense, there's another problem because he said, well, I was drinking beer since noon and then smoking a bunch of marijuana throughout the day and the evening. So, you know, you have a causation problem there too. I think ultimately the problem with his FASD evidence is to the extent it is mitigating, it's really just cumulative of all of the other evidence of his background and character. The only way in which it's different is not mitigating at all. It's aggravating because it says he can still tell right from wrong, but because of this permanent brain condition that he can't do anything about, he can't help it. That is powerful evidence that he will be a future danger, and that's the very reason why this Court and the Supreme Court have recognized that this kind of evidence is necessarily double-edged. Unless there are any further... You're saying that the FASD evidence would be cumulative to the extent that it would be explanatory of his behavior? Yes. Yes. To the extent that it would be... To the extent that it would support the argument that, look, this is a kid who had a terribly disadvantaged background. Nobody's denying that. That evidence is essentially he had no chance, and that's what the FASD evidence is, but there is a wealth of other evidence that would show that, for many other reasons... Wouldn't that tend to rebut, to some extent, maybe not to get him off, but... Well, he's already convicted at this point. But the prosecutor's main argument was, this guy had plenty of chances to make a life, and he didn't do it. Well, if you got FAS, maybe you don't have... Maybe you can't take advantage of those chances. Maybe you end up being easily led into trouble, like he apparently was on this occasion that he's been convicted of. He was not the leader of that group. He was just riding around, and Mr. Cervantes brought the girl in and took her down. And it's appalling to me that five people were involved, and this guy is the only one that gets a death penalty, or gets convicted. Well, he was the stabber, right? Well, the jury did not actually decide... They did not decide that he was the stabber, but there is substantial evidence in the record, and I think this goes to the point that he's the only one that got charged and convicted. There is substantial evidence in the record in the police reports that were collected and summarized in Exhibit 36 to his habeas petition that his co-conspirators pointed the finger pretty strongly at him. And so, to the extent that didn't come out, it allowed his counsel at trial to say, this guy never had a chance. All you've got him on is, you know, he's got some drug convictions, joyriding in a car, carrying a weapon, but those aren't evil things. These aren't violent crimes. He was able to say that because they had not heard from all of his family members and friends about how incredibly violent he actually was. And so, unless the Court has further questions... One of the things that has been helpful in argument, one of the things that I think you and Mr Wolf kind of agree on, but the effect of it you may not agree on, is you indicated that the additional suggested evidence would only provide context and therefore is cumulative. I'm simplifying what you said, but you used the word context. Mr Wolf seems to say the same thing, but he says that the evidence gives depth and texture. I heard him to be saying that even if it is somewhat cumulative, it gives a different perspective for the jury than to assess moral culpability. Would you evaluate for us, from the point of view of the jury, making that final, ultimate decision, what you mean by context? And then Mr Wolf may want to respond about what he calls depth and texture. Well, I don't disagree that generally had the trial counsel, had they interviewed more witnesses and put on more testimony, that the jury would have had more information. They would have had much more detailed context about how Mr Trevino grew up, what he had done, what made him the way he was. My point is only that, on balance, it would not have been helpful, because it would have introduced a number of very, very aggravating circumstances that the jury did not hear about. By helpful, you mean mitigating. Exactly, yes. So I'm happy to answer further questions, but otherwise I would just urge the Court to affirm the judgment of the district court. Thank you, Mr Trevino. Okay, Mr Wolf, you've saved time for rebuttal. May it please the Court. So I want to talk about some of the attributes of fetal alcohol. There's different... It's a spectrum disorder. One of the spectrum is called alcohol-related neurodevelopment disorder, which is when you don't have the morphology, but it affects the brain development. And these are attributes of someone with that condition, which I think is what we have with Mr Trevino. He has mental and behavioural impairments, such as learning disabilities, which we know from his school records, disabilities, poor school performance, poor impulse control, which the interchange with his relatives, with his girlfriend, with his siblings, is indicative of that he has poor impulse control, problems with memory, attention, and judgment, which obviously you were talking about that. Going back, he's always the guy who's left behind. He's the slow one. He's... Judge Dennis was talking about this. He's there with a group of people, and he's the guy who gets the death penalty. The case that he was put on juvenile probation for, he's caught at school. There's a bunch of guys up on the roof. Everyone... Marco, his cousin, in his statement, he recounts this tale, that everybody's on the roof, everyone takes off, Carlos is a little slower than us. He's the one left behind. He's the one that gets caught. He's the one who gets put on juvenile probation for breaking into the school. And that's the story of Carlos. And that's the reason I say it's important to put Carlos's life and his family's life into context so a sentencing jury can hear this person, find out who he is. You know, Judge, you were talking about putting this whole thing in context. If you said, I'm going to show you a picture on a TV, and I'm going to give you a 12-inch black-and-white TV, and you're going to see this, you know, some show on it, and then instead of that, I'm going to show you a 70-inch flat-screen TV, 3-D, you know, with all the bells and whistles, and now you're going to have a different experience when you see the same picture. And that's what I'm talking about when we're talking about fetal alcohol and putting on a mitigation case. You want to see the full picture in depth, where a jury... because they want to hear this. That's the reason they sent that question out. They were struggling with five pages of hardly anything, just a cursory of his life, and they were still wrestling with personal moral culpability. Can you imagine...? Tell us again what the question was. I know it's in the record, but... Can you give us the definition of personal moral culpability? And the judge said, you've got the definition, you know, and that's it. So that's it. When you talk about how much is enough, I think there's a guide... you have a guide, and that is the... In our brief, in our reply brief, we included a chart from Wiggins and Williams and Rompilla and Carlos, and you look at what the evidence was and the aggravators in those cases and the mitigation evidence that was not presented in any of those three cases, and I think this court said on page 33 in its July 11th opinion, quote-unquote, this case is remarkably similar to Wiggins. And I agree with this court. It is remarkably simi... No, we're not bound by that. Well, but... I like it. But I also like page 278 in Gates, where they talked about... when that panel talked about how fetal alcohol affects a case and that whether or not Gates should get relief because of his fetal alcohol problems. Page 734 of this court's opinion from July 11th also said fetal alcohol spectrum disorder also has the potentiality for greater mitigation value. And I can't agree with this court's line. I realize it's presidential value. But that's exactly the point. It has the potential for mitigation value. This court distinguishes Darden and Brown, was the other case, Judge. Brown was the B case. And this court distinguishes those cases to say that Trevino is different. One was used for a different prong in Strickland. In both of those cases, the trial attorney spent, I think, one case, spent 100 hours in the investigation of mitigation evidence and then made a decision not to introduce it. In this case, there was no investigation. This case is remarkably similar to Wiggins. And Mr. Trevino should get the same result as Mr. Wiggins. And Gonzales. I can't stress enough to look at the case, the Gonzales case that's in the record, because it's the same attorney doing the same deficient performance who got relief at the same time in 19... You know, you say, what's the standard in 1997? Well, we know what the standard is in 1997 because the Gonzales case tells us what the standard was in 1997. And not just in Texas, but in Bexar County. By the same attorney doing the same deficient performance. And he gets... And Gonzales had more aggravators, did more egregious things than what the state was able to show against Carlos. But he got relief. And why did he get relief? Because he had a habeas attorney that was able to present it at the time. I wish I had gotten on this case sooner because I would have gotten some more information from the hospital records to show the incidences of Carlos and the APGAR results and what his actual weight was. But when you look at what we were able to put together, in retrospect, going backwards, it is so significant, it is so compelling, it puts Carlos' life into perspective. To understand that he is not morally culpable for what he did. He was infected by his mother's excessive use of alcohol while she was carrying Carlos. I'm not saying Carlos wasn't there that night. He was also charged as a party. They couldn't put the knife actually in his hands. In fact, we produced, on our Brady claim, if you recall, we produced a statement by one of the co-defendants that said Santos did it all by himself. That he took her in the woods and he came back. He was alone with the knife and said the bitch didn't want to give it up and I killed her. But that statement was hidden and that never got in front of the jury either. But we're not here to litigate guilt or innocence. We're here to litigate punishment. And we're here to litigate whether or not he should get a new punishment hearing, not a new trial, total trial. I see my time is up. Yes, your time is up. Your case is under submission, Mr. Wolf, and we appreciate your willingness to take on the appointment in this case and your good work on behalf of your client. Good argument as well from Mr. Frederick. Thank you. The court is in recess.